UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Richard Falk

     v.                                      Civil No. 12-cv-178-JL
                                                Opinion No. 2013 DNH 124
Life Insurance Company of North
America/Cigna Group Insurance


**OPINION & ORDER**

     This case arises out of an employee's claim for long-term

disability insurance benefits due to disc displacement and

discogenic disease in the cervical and lumbar spine, and their

associated symptoms.  Plaintiff Richard Falk, formerly a head

line worker for Unitil Service Corporation, sought benefits from

Life Insurance Company of North America/Cigna Group Insurance

("LINA"), the claims administrator and insurer under Unitil's

long term disability insurance plan.  LINA denied Falk's claim,

and Falk brought suit under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq. asking this

court to overturn LINA's decision and award him benefits under

the plan.  See id. § 1132(a)(1)(B) (authorizing civil actions "to

recover benefits due" under an ERISA plan).  LINA answered,

defending its decision, and also filed a counterclaim against

Falk alleging that under the terms of the plan, it is entitled to

recover benefits it contends were overpaid to Falk.  See id.

§ 1132(a)(3); Cusson v. Liberty Life Ins. Co. of Boston, 592 F.3d 215, 230 (1st Cir. 2010).  This court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) (ERISA).

Both sides have moved for judgment on the administrative record, see L.R. 9.4(c), and have submitted a joint statement of material facts, see L.R. 9.4(b).  Each side has also submitted a list of disputed facts.  See id.  After oral argument and an exhaustive review of the record, judgment is granted to LINA on Falk's claim, as the record does not establish--even under a de novo standard of review--that Falk was disabled from performing "any occupation for which he . . . is, or may reasonably become, qualified based on education, training or experience," as required for him to qualify for long term disability benefits under Unitil's plan.  Based on the submitted record, judgment is granted to LINA on the counterclaim as well.

## I.  **Applicable legal standard**

The standard of review in an ERISA case differs from that in an ordinary civil case, where summary judgment is designed to screen out cases that raise no trialworthy issues.  See, e.g., Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).  "In the ERISA context, summary judgment is merely a

vehicle for deciding the case," in lieu of a trial.  Bard v.
Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006).  Rather
than consider affidavits and other evidence submitted by the
parties, the court reviews the denial of benefits based "solely
on the administrative record," and neither party is entitled to
factual inferences in its favor.  Id.  Thus, "in a very real
sense, the district court sits more as an appellate tribunal than
as a trial court" in deciding whether to uphold the denial.
Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002).

        Courts apply varying degrees of scrutiny in reviewing a
denial or termination of benefits under ERISA.  Review is de novo
"unless the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan."  Firestone Tire & Rubber Co.
v. Bruch, 489 U.S. 101, 115 (1989).  Thus, if the plan gives the
administrator or fiduciary discretionary authority, "the
administrator's decision must be upheld unless it is arbitrary,
capricious, or an abuse of discretion."  Wright v. R.R. Donnelley
& Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005).

        The court will assume, without deciding, that the less
deferential de novo standard of review applies in this case
(though the court appreciates the parties' thoughtful and

thorough arguments on which standard the court should apply).[1]

---

[1]The court remains more than a little skeptical about LINA's reliance on a "Group Disability Insurance Certificate," which it issued to Unitil for delivery to its employees under the plan, as the source of a grant of discretionary authority to it.  The Certificate explains that it "makes up the Summary Plan Description as required by ERISA," and LINA, in relying on it, would therefore seem to run headlong into the Supreme Court's opinion in CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2011).

In Amara, the Solicitor General (as amicus curiae) argued–- as LINA does here--that "the 'plan' includes the disclosures that constitut[e] the summary plan descriptions." Id. at 1877.  The Court observed that this argument was "difficult to square" with both ERISA's language, which "suggests that the information about the plan provided by those disclosures is not itself part of the plan," and "the statute's division of authority between a plan's sponsor and the plan's administrator." Id.  As the Court explained, "ERISA carefully distinguishes these roles," providing that a plan sponsor "creates the basic terms and conditions of the plan" while the plan administrator "manages the plan, follows its terms in doing so, and provides participants with the summary documents that describe the plan (and modifications) in readily understandable form." Id.  Finding "no reason to believe that the statute intends to mix the responsibilities by giving the administrator the power to set plan terms indirectly by including them in the summary plan descriptions," the Court rejected the Solicitor General's argument, concluding "that the summary documents . . . provide communication with beneficiaries about the plan, but that their statements do not themselves constitute the terms of the plan." Id. at 1877-78.

This holding, coupled with the fact that both the policy (which is the primary plan document) and the Certificate itself take pains to make clear that the Certificate is not a part of the contract of insurance, significantly undercuts LINA's attempt to rely upon the terms of the Certificate as a grant of discretionary authority. See, e.g., Sullivan v. Prudential Ins. Co. of Amer., No. 2:12-cv-1173, 2013 WL 1281861 (E.D. Cal. Mar. 25, 2013); Durham v. Prudential Ins. Co. of Am., 890 F. Supp. 2d 390, 395-96 (S.D.N.Y. 2012).  The court need not resolve this issue, however, in light of its conclusion that Falk has not carried his burden of showing that he is disabled even under a de novo standard.

Under the de novo standard, the court must determine, after a full review of the administrative record, whether the denial of benefits was correct.  See, e.g., Orndorf, 404 F.3d at 518. Although the de novo standard allows the court to substitute its judgment for that of the plan administrator, the claimant still carries the burden of demonstrating that she is disabled within the terms of the plan.  See id. at 519; see also, e.g., Terry v. Bayer Corp., 145 F.3d 28, 34 (1st Cir. 1998).  In sum,

> de novo review generally consists of the court's independent weighing of the facts and opinions in [the] record to determine whether the claimant has met his burden of showing he is disabled within the meaning of the policy.  While the court does not ignore facts in the record, the court grants no deference to administrators' opinions or conclusions based on these facts.

Orndorf, 404 F.3d at 518 (citation omitted).

## II.  **Background**

### A.   **Falk's application for disability benefits**

Falk, who is 52 years old, was employed by Unitil Service Corporation as a head line worker.  As a Unitil employee, Falk participated in the company's group disability insurance plan. LINA was the insurer and claims administrator under the plan.

Under Unitil's group disability insurance policy, an employee is initially defined as disabled, and thus becomes eligible for disability benefits,

> if, solely because of Injury or Sickness, he or she is:
>
> > 1.   unable to perform the material duties of
> >       his or her Regular Occupation; and
> >
> > 2.   unable to earn 80% or more of his or her
> >       Indexed Earnings from working in his or
> >       her Regular Occupation.

After benefits "have been payable for 24 months," however, the employee remains eligible for benefits only

> if, solely due to Injury or Sickness, he or she is:
>
> > 1.   Unable to perform the material duties of any
> >       occupation for which he or she is, or may
> >       reasonably become, qualified based on
> >       education, training or experience; and
> >
> > 2.   Unable to earn 80% or more of his or her
> >       Indexed Earnings.

Falk hurt his back while lifting cable in 1993.  After fusion surgery on his lumbar spine, Falk returned to work while continuing to receive medical treatment, including pain medication and epidural steroid injections.  In late 2007, however, Falk stopped working due to increasing pain in his spine.  Though he attempted to return to work in early 2008, he was unable to remain on the job due to his pain, and applied for total disability benefits from LINA later that year.  After initially denying Falk's claim in late 2008, LINA ultimately determined that Falk was incapable of performing the heavy physical requirements of his job as a head line worker, and was

thus disabled within the meaning of the policy.  It therefore approved his claim and began paying him monthly benefits in the amount of $3,970.00.

In early 2010, Falk applied for disability benefits from the Social Security Administration, which determined that Falk was disabled (as that term is defined by the Social Security Act and its implementing regulations) as of December 2008.  Falk began receiving monthly Social Security disability benefits in the amount of $2,865.08.  Falk also received a lump payment for retroactive benefits, going back to December 2008, that had accrued prior to the Administration's determination.

The policy acknowledges that an employee who is eligible for disability benefits under its terms might also be eligible for benefits from other sources, including Social Security disability benefits.  It provides that, in that event, LINA "may reduce the Disability Benefits by the amount of such Other Income Benefits." It further provides that LINA "has the right to recover any benefits it has overpaid" by either "request[ing] a lump sum payment of the overpaid amount;" "reduc[ing] any amounts payable under this Policy; and/or tak[ing] any appropriate collection activity available to it."  Upon learning that Falk had been awarded Social Security disability benefits for most of the period for which LINA had paid him benefits under the policy,

7

LINA concluded that it had overpaid Falk by about $40,000.  LINA thus wrote to Falk requesting that he repay this overpayment in bulk.  After Falk failed to do so, LINA began applying his monthly payments (now reduced, in light of the award of Social Security benefits) to this balance on a going-forward basis.

LINA continued paying benefits to Falk (or, more accurately, applying Falk's benefit payments to the claimed overpayment balance) until October 2010, the end of the initial 24-month period during which an employee is considered disabled under the terms of the policy if he is unable to perform the material duties of his regular occupation.  That month, LINA informed Falk that, based upon the evidence before it, it had determined he was not disabled, as he was not (in its opinion) incapable of performing "any occupation" for which he was, or might reasonably become, qualified.  After a lengthy internal appeals process (during which Falk submitted additional medical records), LINA upheld its determination in November 2011.  Falk responded by filing the present action.

### B.   The administrative record

As noted above, in 2007 and 2008, Falk began experiencing increasing pain in his neck and back, which Falk's treating physiatrist, Powen Hsu, attributed to lumbar disc displacement

8

and radiculitis of the thoracic and lumbar spine.  Epidural steroid injections were initially able to provide Falk with some relief, and Hsu released him to return to work in February 2008.

Two weeks after returning to work, Falk reported "no baseline pain" and was "able to tolerate a full day of work without difficulty" (though he did report occasional pain on his left side).  A little over three weeks after that, however, Falk complained of increased pain which caused "significant difficulty with walking and standing" and "bending activities."  Hsu prescribed medication (specifically, a Medrol pak), "which relieved [Falk's] pain completely."  Roughly a month later, though, Falk experienced a sudden onset of pain while picking up a piece of siding.  According to Falk, that pain remained for over three days.  After observing mild limitations in Falk's range of motion, Hsu again prescribed Medrol, which again improved Falk's pain--at least initially.  After another month passed, Falk reported that his pain had slowly returned to "full force," such that he experienced difficulty "with his daily activities of getting out of bed and performing his daily self care," and that his pain increased with "any activities especially standing and walking."  Hsu again prescribed Medrol, which had no effect on Falk's pain; a trigger point injection was also unsuccessful.

9

After an MRI revealed increased herniation in Falk's lumbar
spine, Hsu ordered an epidural steroid injection, which
temporarily reduced Falk's pain.  Hsu surmised that Falk would be
able to return to work in two weeks (or by mid-July 2008).  That
prediction did not prove true, however, as Falk continued to
experience pain in his back and legs.

In September 2008, Falk also began to complain of neck and
shoulder pain radiating into his left arm, and showed significant
limitations in range of motion in his lumbar and cervical spine.
After examining Falk and reviewing the results of an MRI, Hsu
attributed this "intractable pain"––as he characterized it––to
disc osteophytes in Falk's cervical spine.  Following that visit,
Hsu opined that, due to his diagnoses of multi-level cervical
discogenic disease, lumbar disc displacement and thoracic/lumbar
spine radiculitis, Falk had "no work capacity."  Hsu also
completed a statement of disability form, checking boxes to
indicate that Falk (a) was completely incapable of climbing,
balancing, stooping, kneeling, crouching, crawling, reaching,
walking, sitting, or standing; and (b) could not lift, carry,
push, or pull any weight whatsoever.  Roughly a month later, in
late November 2008, Hsu opined that these restrictions remained
largely the same (by re-checking the appropriate boxes).  Hsu
did, however, refine his opinion to reflect that Falk could climb

10

stairs and balance up to 2.5 hours per day, and that Falk's
diagnoses did not impact his ability to reach.

Falk's arm pain eventually subsided, though he continued to
experience back and leg pain, causing some limitation of motion
in his lumbar and cervical spine.  In mid-2009, Hsu opined that,
although Falk was able to control his pain with medication, he
was "unable to perform any work duties"--including sedentary
work--due to his pain.  Falk's pain lasted throughout 2009, with
intermittent relief from epidural steroid injections performed by
Dr. Robert Spencer of Interventional Pain Management.

In January 2010, Falk attended a Functional Capacity
Evaluation ("FCE") at LINA's request.  The therapist who
evaluated Falk, Nicole McManus, noted that his gait and posture
showed a lumbar shift to the left.  Falk's gait further exhibited
antalgia, which was particularly evident after prolonged sitting,
and antalgia was also noticeable during sit-to-stand and sit-to-
supine transfers.  His lumbar sidebending and extension were
limited by a "structural stop", while his cervical sidebending
and rotation were limited by pain, as were his shoulder range of
motion and strength.  McManus noted Falk's "limited position
tolerance - any prolonged standing, sitting or brisk walking
notably increased low back pain and frequently proximal left leg
pain."  McManus also observed that Falk "participated in all

11

activities but limited some activities prior to objective signs of maximal performance due to reports of low back pain, left buttock and leg pain."

Based upon these and other observations, McManus opined that Falk was "at high risk for developing prolonged disability and work absence due to his pain impeding on all aspects of his life," and that his "perceived activities at home and his FCE performance [were] consistent with significant functional limitations in regard to lifting, bending, walking and prolonged static positions."  In her assessment, Falk could sit, stand, walk, reach below his waist, lift one to fifteen pounds, carry one to thirty-five pounds, push, pull, climb, stoop, kneel, and crawl no more than two and a half hours in an eight-hour workday.

LINA also conducted sporadic surveillance of Falk beginning in January 2010.  The first day of this surveillance was the day of Falk's FCE.  Surveillance videotape recorded that day shows Falk leaving his home in the morning and walking from his home to his car with no apparent antalgic gait, or any other difficulty walking.  According to the report of the investigator who conducted the surveillance, Falk then traveled to a bank, where he also "walked without any visible limitations when entering." (The record contains no videotape of Falk's stop at the bank.) Falk then traveled to McManus's clinic for his FCE.  Falk's

arrival at the clinic is documented in the videotape, in which his gait has changed noticeably.  He exhibits obvious signs of antalgia while walking slowly from his car into the clinic.  When leaving the clinic four hours later, Falk again walks with an antalgic gait, albeit less pronounced than before.  Surveillance video recorded the following day also shows Falk leaving his residence and getting into his car, with no apparent antalgia.

Following the FCE, Falk reported an increase in cervical and lumbar pain to Hsu, which Hsu attributed to acute strain from the FCE.  A transferable skills analysis ("TSA") performed shortly after the FCE "to determine if there were transferable occupations based on [Falk's] work history, education, wage requirements and limitations and restrictions" determined that, "[d]ue primarily to [Falk's] high wage replacement, transferable occupations at a sedentary level could not be identified."

LINA conducted additional surveillance of Falk in February and March 2010.  The February surveillance session, stretching over three consecutive days, revealed little about Falk's condition.  Videotape recorded during the first day of surveillance shows a man who appears to be Falk arriving at his residence in the mid-afternoon and walking around the outside of the property with no apparent difficulty or antalgia.  The following day, investigators recorded a brief segment of video

13

showing Falk getting into his car; according to the
investigators' report, Falk then departed his residence for a
Mobil station before returning home, then leaving again for an
undetermined location.  On the third day, investigators neither
recorded nor observed outside activity by Falk.

The March surveillance session was somewhat more fruitful.
Investigators recorded videotape of Falk that depicts him
accompanying acquaintances to two locations:  an auto parts
dealership and a gas station.  (According to the investigators'
report, Falk also visited at least two other locations, which are
not depicted in the video footage.)  There is no clear footage of
Falk's visit to the auto parts dealership, but videotape recorded
at the gas station shows Falk walking around the outside of the
station and climbing into the cab of a pickup truck with no
apparent difficulty or antalgia.

Falk visited Hsu again in early April 2010 and reported that
his pain control had improved after he lost 43 pounds.  Aside
from "difficulty" with his arms and shoulders while sleeping,
Falk professed himself "happy with his pain regimen."  Hsu
prescribed Oxycodone and an epidural steroid injection, which Dr.
Spencer performed in early to mid-June 2010.  Falk reported
"significant pain improvement" as a result of the injection.

14

At more or less the same time, a LINA vocational specialist performed another TSA to determine "at what physical demand level transferable occupations" for Falk could be identified.  Taking into account Falk's wage requirement, level of education, and work history, the specialist identified no transferable occupations at the sedentary level of physical demand.  He also opined that "[a]t the light level, occupations in the areas of maintenance and service supervision, preventative maintenance coordination and sales positions could potentially be identified," but remarked that, "[i]n order to complete a formal TSA, updated limitations and restrictions would be required."

In what appears to be an effort to obtain these "updated limitations and restrictions," LINA sought to schedule Falk for an independent medical evaluation ("IME"), initially scheduling him for an IME with orthopedic surgeon Anthony Marino.  But LINA was forced to reschedule with another orthopedic surgeon, David Publow, after Marino declined to perform the IME.  Publow himself declined to perform the IME, and LINA ultimately scheduled Falk for an IME with orthopedic surgeon Kenneth Polivy in September 2010.

In the meantime, LINA again conducted surveillance of Falk in mid-August 2010.  The investigator observed no activity around Falk's residence on the first day of the two-day session.  On the

15

second day, however, the investigator observed Falk at an auto parts dealership, and obtained video of Falk in the parking lot of the dealership with two other people.  In the video, Falk walks and enters his automobile without any apparent difficulty or antalgia.

Polivy's IME the following month consisted of a review of Falk's medical history and treatment, including the FCE performed in January 2010, a review of the surveillance video of Falk, and a physical examination.  After noting that Falk stood "with level hips and level shoulders," walked "without an antalgic gait," and was "able to heel walk and toe walk without difficulty," Polivy concluded that Falk's symptoms were "consistent with lumber degenerative spondylitis status post anterior lumber fusion as well as cervical degenerative spondylitis with intermittent left arm radiculopathy."  Polivy observed that Falk's "subjective pain complaints are supported by objective findings," and that his "clinical examination and medical records correlate with his self-reported activities of daily living."  Polivy "agree[d] with the assessment of the [FCE] indicating, in essence, that Mr. Falk is capable of full time light duty work activity and he should avoid any overhead activities."  He continued:  "[Falk] should not work with his shoulders overhead nor should he be required to look overhead on a regular basis."

16

Polivy also completed a physical ability assessment form indicating that, in his opinion, Falk was capable of sitting, standing, and walking frequently (i.e., 2 ½ to 5 ½ hours per day) and lifting and carrying 10 pounds frequently and 11-20 pounds occasionally (i.e., up to 2 ½ hours per day).  On the form, Polivy also opined that Falk was capable of pushing up to 40 pounds and pulling up to 30 pounds occasionally, and capable of balancing, stooping, kneeling, crouching, and crawling occasionally as well.  Consistent with the remarks in his report, Polivy opined that Falk was incapable of reaching overhead and of lifting and carrying weights greater than 20 pounds.

After receiving Polivy's IME report, LINA contacted him to obtain "clarification" regarding the "FCE reference" in the report.  Polivy's addendum, provided in early October 2010, explained:

> [I]t is noted that I agreed with the functional capacity evaluation that was performed.  In my opinion, Mr. Falk demonstrated the capacity to perform a full time light duty work activity with a lifting restriction of 15 pounds from floor to waist on an infrequent basis and no overhead lifting and no repetitive lifting from waist to shoulders.  The functional capacity evaluation apparently concludes that Mr. Falk has a less than sedentary capacity.  It does however note that he is capable of lifting 15 pounds and performing other activities.
>
> Therefore, based upon my physical examination, review of the records, and Mr. Falk's physical presentation at the time of the exam, it is my opinion that he is

17

> capable of full time light duty work activity.  This
> would be at a greater work capacity than was noted in
> the functional capacity evaluation.

Later that month, LINA's vocational specialist performed a new TSA that took into account the "updated limitations and restrictions" provided by Polivy.  After reviewing Falk's previous work experience, education, and training, the vocational specialist concluded that Falk was capable of performing several different jobs "in the labor market of Manchester, NH."  These included, but were not limited to maintenance supervisor in the utilities industry (which was akin to Falk's position at Unitil); instrument-shop supervisor or line supervisor in the telephone and telegraph industry; and service supervisor, maintenance supervisor, or preventive maintenance supervisor in any industry. It was after receiving these results that LINA initially informed Falk that it had determined he was not disabled, as discussed in the preceding section, setting off the internal appeals process, and, ultimately, this action.

Medical records for the period before and immediately after the IME and renewed TSA show that Falk received only sporadic treatment.  As already noted, Falk received an epidural steroid injection in June 2010, which provided him with significant relief.  Though Hsu's notes indicate that Falk had been scheduled to receive another injection in mid-July 2010, there is no

evidence in the record that he did.  Nor is there record of any
other treatment until early November 2010, when Falk told Hsu of
increased neck pain, accompanied by "right sided chest pain" that
began after a fall.  Hsu ordered a MRI and prescribed Medrol,
which relieved Falk's pain.  The MRI revealed severe foraminal
stenosis of the cervical spine.  An MRI performed in late January
2011, after Falk reported increased lower back pain, similarly
revealed stenosis of the lumbar spine as well as foraminal
narrowing at the first sacral vertebra.  Hsu again prescribed an
epidural steroid injection, which had again significantly
improved Falk's pain as of late February 2011.  Hsu later ordered
a repeat injection, which again decreased Falk's lower back pain.

    Not long thereafter, orthopedic surgeon John Schneider
reviewed Falk's medical records at LINA's request.  Schneider
also spoke to Spencer--who stated that he had not seen Falk since
July 2010 and had no further information to provide--and tried
several times to speak to Hsu, leaving messages that went
unreturned.  Schneider concluded:

> [T]he restrictions outlined by the treating providers
> (Dr. Hsu and Dr. Spencer) are not supported.  The data
> indicates the claimant can work full-time at a light
> PDL.  The submitted clinical records indicate that the
> claimant has undergone a functional capacity evaluation
> as well as an independent medical evaluation [in
> September 2010].  In a clarification to that report Dr.
> Kenneth Polivy notes that the claimant could perform a
> full time light duty capacity with lifting restriction

of 15 pounds from floor to waist, no overhead lifting
and no repetitive lifting from waist to shoulders.  The
available data as provided does not provide any
objective evidence to refute these recommendations.
Therefore, the recommendations for the claimant to
remain off work are not supported.

Shortly after receiving Schneider's report, LINA upheld its

initial determination that Falk was not disabled.  Falk notified

LINA of his desire to appeal that determination again in early

August 2011.  A week or so later, he visited Hsu, complaining of

increased pain.  As Falk claimed to be unable to afford a further

epidural steroid injection, Hsu prescribed oxycodone.  Hsu then

completed a medical source statement in which he opined that Falk

could sit or stand no more than two hours in an eight-hour

workday, and could do so a maximum of 15 minutes before needing

to change positions, thus requiring a job that would permit him

to shift positions at will and take unscheduled breaks during the

workday.  Hsu further opined that Falk could twist, stoop,

crouch, climb stairs, and lift ten pounds only rarely, and could

lift weights less than ten pounds only occasionally.

About two months later, in late October 2011, Mark Ferlan,

DO, of Derryfield Medical Group, wrote a letter stating that Falk

was being seen "for severe neck osteoarthritis and foramenal

[*sic*] stenosis and is unable to work currently."  The letter

continued: "[d]ue to the degeneration of [Falk's] cervical spine,

his cervical motion is limited to 30-45 degrees in all planes. He is unable to lift more than 5 pounds.  He is currently being evaluated for spinal surgery."

Early the following month, LINA referred Falk's file for an internal review by its Associate Medical Director, internist Michael Atta.  After reviewing "all of the medical, vocational, and clinical information provided by company personnel bearing on [Falk's] claim," Atta opined that "with a reasonable degree of medical certainty . . . the restrictions and limitations are not supported."  He explained that "[t]here are no quantifiable, significant, documented findings which demonstrate a functional loss which would preclude sitting and the use of upper extremities."  Shortly thereafter, LINA informed Falk that it was upholding its previous determination that he was not disabled, within the meaning of Unitil's policy, as of October 2010.

## III. **Analysis**

### A.   **Falk's claim for benefits**

ERISA is a statutory framework that "Congress enacted . . . to protect the interests of participants in employee benefit plans," Johnson v. Watts Regulator Co., 63 F.3d 1129, 1132 (1st Cir. 1995), and to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law," N.Y. State Conf. of

Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S.
645, 656 (1995).  To promote those objectives, ERISA provides
that an employee who participates in an "employee welfare benefit
plan" (as defined in 29 U.S.C. § 1002(1)) may bring a civil
action against the plan's administrator "to recover benefits due
to him under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B).
Here, the parties agree that Unitil's disability plan qualifies
as an employee welfare benefit plan covered by ERISA, and that
Falk was one of its participants.  The relevant question, then,
is whether § 1132(a)(1)(B) entitles Falk to recover disability
benefits.

        In analyzing Falk's claim, the court begins with the basics:
a "guiding principle in conducting de novo review" in ERISA cases
"is that it is the plaintiff who bears the burden of proving he
is disabled."  Orndorf, 404 F.3d at 518-19.  To meet that burden,
the terms of Unitil's plan require Falk to prove that, "solely
due to Injury or Sickness," he is "[u]nable to perform the
material duties of any occupation for which he . . . is, or may
reasonably become, qualified based on education, training or
experience."  He has not done so.

        It is clear from the record that Falk suffers from back and
neck ailments that limit his ability to work.  All the varying
medical professionals whose opinions appear in the record agree

on that point, which is amply supported by the results of MRIs
and other objective medical tests.  Indeed, LINA recognized as
much, concluding in 2008 that Falk was eligible for disability
benefits due to his inability to perform his job as a head line
worker.  The key issue, though, is the <u>extent</u> to which Falk's
back and neck problems limit his ability to work.  Do they render
him incapable of performing the physical requirements of any job
for which he might reasonably be qualified, as the opinions of
Drs. Hsu and Ferlan suggest, or can he still perform light duty
work, as Drs. Polivy, Schneider, and Atta opine?

Falk's memorandum is of little utility to the court in
answering this question, and determining which of the competing
medical opinions to credit.  While the memorandum is 46 pages
long (21 pages longer than this court's typical page limit for
dispositive memoranda, <u>see</u> L.R. 7.1(a)(3)), over half of this
total comprises a recitation of the facts that is largely
duplicative of Falk's statement of disputed facts, filed
separately pursuant to Local Rule 9.4(b).  A good deal of the
remaining page count is devoted to arguing that this court should
apply a heightened level of scrutiny to LINA's denial of benefits
due to a "structural conflict" (i.e., LINA's status as both the
entity paying benefits and determining eligibility for them, <u>see</u>

23

generally [Metro. Life Ins. Co. v. Glenn](), 554 U.S. 105 (2008)).[2]
Adjusted for Falk's introduction and statement of the standard of
review, little more than a page of argument and analysis remains
(supplemented by a few rhetorical flourishes tucked into
inconspicuous corners of the memorandum).[3]

These meager morsels of argument are not enough to sustain a
successful challenge to LINA's denial of benefits.  The core of
Falk's argument–-what he characterizes as "the most unusual
feature of this case, and most damning to LINA's position"–-is
that both of the orthopedic surgeons LINA initially contacted to
perform an IME (Drs. Marino and Publow) declined to perform the
examination after being provided Falk's medical records.  Pl.'s
Mot. for J. on Admin. R. (document no. 22) at 45.  Conceding that
"[t]he record contains no evidence of why these doctors refused

---

[2]Because this court is reviewing LINA's decision de novo,
the existence of a structural conflict is ultimately irrelevant
to the standard of review, see, e.g., [Coffin v. Bowater Inc.,]() 501
[F.3d 80, 92-93 (1st Cir. 2007)](); [Kansky v. Coca-Cola Bottling Co.]()
[of New England,]() 492 F.3d 54, 58 [(1st Cir. 2007)](), as counsel for
both parties agreed at oral argument.

[3]Given the cursoring of Falk's argument, the court could
easily "fall back upon the prudential rule that 'issues adverted
to in a perfunctory manner, unaccompanied by some effort at
developed argumentation, are deemed waived.'" [Marek v. Rhode]()
[Island,]() 702 F.3d 650, 655 (1st Cir. 2012) (quoting [United States]()
[v. Zannino,]() 895 F.2d 1, 17 (1st Cir. 1990)).  Rather than doing
so, this court has endeavored to give Falk's argument the fullest
consideration possible.

to do the 'case,'" Falk nonetheless asks this court to indulge
the "assumption that they did not believe they could render an
opinion that would be helpful to LINA." Id. at 27.  (The dual
implications of this assumption being that Drs. Marino and Publow
believed Falk to be totally disabled, and that Dr. Polivy may
have shaded his opinion to favor LINA.)  But, in the absence of
any evidence that Falk's preferred explanation for the doctors'
refusal to perform the IME is any more likely than one of the
much simpler and less nefarious alternatives (such as, for
example, that the doctors simply lacked the time to review Falk's
records and examine him), the court is unwilling to take this
logical leap.[4]

Far more important to the court's conclusion are the medical
opinions that are actually in the record:  those of Drs. Hsu,
Ferlan, Polivy, Schneider, and Atta.  Yet Falk dedicates little

---

[4]The court acknowledges that Falk previously moved for
discovery into "the reasons Dr. Publow and Dr. Marino declined to
review the plaintiff's file," among other things, see Mot. for
Discovery Outside the Admin. R. (document no. 26) at 2, and that
the court denied that motion, see Order of May 1, 2013.  Given
this state of affairs, Falk might understandably complain that he
could have remedied the evidentiary deficiencies just identified
if the court had only granted his motion.  If Falk believed such
discovery was warranted, though, he was obliged to request it
within 14 days after the administrative record was served.  See
L.R. 9.4(a).  He did not do so--indeed, his motion for discovery
was not filed until the case was fully briefed--and thus Falk
himself bears the responsibility for any gap in the evidence.

space in his memorandum to the relative merit of these opinions.
He does not argue, as claimants in ERISA cases often do, that the
court should credit the opinions of Hsu and Ferlan over those of
the other three doctors because Hsu and Ferlan actually treated
him and have a longitudinal view of his medical impairments.
And, at least in Ferlan's case, such an argument would ring
hollow in any event.  The only documentation of any kind from
Ferlan in the record is the terse letter in which he opines that
Falk "is unable to work currently" and "is unable to lift more
than 5 pounds."  The letter does not explain how long Ferlan had
been seeing Falk,[5] nor does it provide any explanation as to how
Ferlan arrived at his conclusions.  Without such an explanation,
or at least some other evidence of the length and nature of
Ferlan's treatment relationship with Falk, Ferlan's conclusory
opinion is entitled to little weight in the court's analysis.[6]

---

[5]A handwritten notation on the letter says that Ferlan is a
"Family Doctor."  It is not apparent to the court that this means
that Ferlan is Falk's family doctor (though the parties appear to
agree that he is), and even if he is, it does not necessarily
follow that Ferlan regularly saw Falk himself, as opposed to
other members of his family.  Again, there is no other record of
Ferlan's treatment of Falk.

[6]The court also accords little weight to the Social Security
Administration's finding that Falk was disabled, to which Falk
makes passing reference in his memorandum.  See Pl.'s Motion for
J. on Admin. R. (document no. 22) at 35 (arguing that the court
should consider this finding); id. at 37 (similar).  That finding
is not entirely irrelevant.  See Pari-Fasano v. ITT Hartford Life

Cf. Prince v. Metro. Life Ins. Co., 2010 DNH 046, at 32 ("An
insurer is not required to blindly accept conclusory findings
provided by an insured's physician.").

As Hsu treated Falk over an extended period of time, his
opinions as to Falk's capabilities are the strongest evidence in
support of Falk's position, and require a bit more consideration.
Ultimately, however, those opinions are also insufficient to meet
Falk's burden of proving disability.

As discussed in Part II.B supra, Hsu rendered opinions as to
Falk's physical capacity on three occasions.  In late 2008, Hsu
completed a physical ability assessment form, opining that Falk
had "no work capacity" and checking boxes to indicate that Falk
had no ability whatsoever to perform a wide range of basic tasks
including kneeling, crouching, walking, sitting, and standing,
see Admin. R. at 850-52, an exercise he repeated again two months

_____

& Accident Insurance Co., 230 F.3d 415, 420 (1st Cir. 2000);
Prince, 2010 DNH 046, at 17-18 n.7.  Because, however, "[t]he
criteria for determining eligibility for Social Security
disability benefits are substantively different than the criteria
established by many insurance plans," the Administration's
decision on a claim for Social Security benefits "should not be
given controlling weight except perhaps in the rare case in which
the statutory criteria are identical to the criteria set forth in
the insurance plan." Pari-Fasano, 230 F.3d at 420.  This is not
one of those cases (and Falk does not argue that it is).  Nor is
there any indication in the record as to the medical conditions
and medical evidence upon which the Administration based its
decision, so that evidence may have been quite different from the
evidence contained in the administrative record of this case.

later, see id. at 848-49.  And, in mid-2011, he again rendered an opinion that disqualified Falk from most (if not all) light work, pronouncing that Falk could sit or stand no more than two hours in an eight-hour workday, and could do so for a maximum of 15 minutes before needing to change positions.  See id. at 360-64.

Notably, it does not appear that Hsu undertook any clinical testing to determine Falk's physical restrictions and limitations before rendering any of these opinions.  His records of his physical examinations of Falk, while documenting some limitations in Falk's range of motion, are not reflective of the severe limitations included in the opinions.  Hsu's 2008 opinions are, moreover, internally inconsistent: although Hsu stated that Falk was incapable of walking or standing at all, he also stated that Falk was capable of climbing stairs up to 2.5 hours per day, see id. at 851--a task that would seemingly be beyond the reach of someone with no ability to stand or walk.  This contradiction gives rise to the appearance that Hsu first arrived at the conclusion that Falk had "no work capacity," see id. at 849-50 (not an unreasonable one, given the heavy physical requirements of Falk's previous employment as a head line worker) and, rather than carefully measuring and documenting Falk's physical abilities, simply checked off boxes supporting that conclusion.

28

This observation is not intended to suggest that Hsu's assessment was less than honest.  To the contrary, the court simply assumes that Hsu, like many physicians, has a busy practice and, when confronted with a form asking him whether his patient could return to his job, did not conduct a meticulous assessment of Falk's physical abilities.[7]  The court is also mindful of the Supreme Court's admonition that "a treating physician, in a close case, may favor a finding of 'disabled.'" Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003); cf. Thomas v. Ga. Pac. Corp., No. 05-cv-357, 2006 WL 1207610, at *6 (E.D. Okla. Apr. 28, 2006) ("[T]reating physicians are paid by the patient.  A treating physician's livelihood may often hinge on a continuing relationship with his patients--a relationship that may very well rest upon (or be reinforced by) the physician making findings desired by the patient.").

Hsu's 2011 opinion as to Falk's capabilities is, to be sure, more nuanced, thoughtful, and internally consistent.  As already stated, though, that opinion apparently does not rely upon the results of any clinical testing of Falk's physical

_____

[7]That Hsu has a busy practice is perhaps evidenced by the multiple occasions on which he did not respond to inquiries about Falk, which LINA details in its memorandum.  The court does not, at any rate, view Hsu's unresponsiveness on these occasions as "consistently evasive," which is how LINA characterizes it.  See, e.g., Deft.'s Mot. for J. on Admin. R. (document no. 25) at 15.

restrictions and limitations, and instead appears to be based upon Falk's own subjective complaints.  Acceptance of those complaints is "more or less required of treating physicians," Maniatty v. Unumprovident Corp., 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), so Hsu again cannot be faulted for this, but it makes the court reluctant to place too much weight upon Hsu's opinion.  See Colassi v. Hartford Life & Accident Ins. Co., 2012 DNH 086, 16-18 (appropriate to accord little weight to treating physician's opinion when it "finds little record support in the form of objective examinations or test results").  This reluctance aside, the court might nonetheless be more inclined to accept Hsu's opinion if it were the only opinion as to Falk's abilities in the record.  It is not.

Countering Hsu's opinion are the opinions of Drs. Polivy, Schneider, and Atta, all of whom, unlike Hsu, were able to review the full scope of the record, including all the medical records Falk had submitted, the surveillance videotapes and reports, and, significantly, the report of the January 2010 FCE.  Polivy also performed a physical examination of Falk.  All three opined that Falk was not as restricted as Hsu indicated.

The court recognizes, of course, "that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money

30

and to preserve their own consulting arrangement." Nord, 538 U.S. at 832 (some internal quotation marks omitted).  But there is little reason to believe that this is the case here.  There is no evidence that Polivy or Schneider had been "repeatedly retained by benefits plans," or, more significantly, that they even knew what findings they would need to make to ensure a conclusion that Falk was not disabled.[8]  And in fact, Polivy's and Schneider's opinions that Falk was only capable of light duty work would have supported a conclusion that Falk was disabled if the definition of disability turned on Falk's ability to perform his "Regular Occupation" (as it did for the 2 years during which LINA paid benefits).

Of the opinions rendered by these three doctors, Falk has trained his sights solely on Polivy's opinion, and raises no issues with the opinions rendered by Schneider or Atta.  But see supra n.8.  Falk raises the specter of bias on Polivy's part, suggesting that Polivy's initial opinion "was unsatisfactory [to LINA], and he had to be prompted to include an addendum that would place Mr. Falk's work capacity within the framework of jobs

---

[8]Atta presents a somewhat different situation.  As a LINA employee, he presumably had access to LINA's entire file concerning Falk's case.  He also had a greater incentive to render an opinion favoring LINA.  Thus, although Falk has not raised any concern about Atta's impartiality, the court has given Atta's opinion negligible weight in its analysis.

which [LINA's vocational specialist] had already identified."
Pl.'s Mot. for J. on Admin. R. (document no. 22) at 45.

The record, however, reveals that the circumstances surrounding LINA's request for an addendum were far less self-serving, and that the addendum did not alter Polivy's opinion as Falk asserts.  Polivy's original report purported to "agree with the assessment of the [FCE]," but opined that Falk was capable of light duty work and attached a physical ability assessment form indicating that Falk had a greater tolerance for sitting, standing, and walking than the FCE had indicated.  Had LINA desired a finding that placed Falk's work capacity "within the framework of jobs" already identified, then, it could simply have accepted without question this assessment of Falk's work capacity, which did just that.  Instead, LINA sought to have Polivy clarify how he could both "agree with the assessment of the [FCE]" and yet arrive at a different conclusion as to Falk's ability to sit, stand, and walk.  If anything, then, LINA's request provided Polivy with the opportunity to revise his opinion in <u>Falk's</u> favor--not LINA's.  Instead, Polivy's opinion remained the same after he provided the addendum, i.e., that Falk was "capable of full time light duty work activity."[9]

---

[9]Falk has not attacked Polivy's opinion (or the opinions of Schneider and Atta) by arguing that it is inconsistent with the

Falk's other shots at Polivy's opinion also sail wide of the mark.  Falk observes that Polivy's report contained an inaccuracy in its recounting of his medical history, see id. at 28, but it is not apparent to the court that this inaccuracy tainted Polivy's opinion in any way, and Falk does not argue that it did. Falk also notes that Polivy's observation that Falk had no antalgic gait "was inconsistent with that of the therapist who performed the FCE, and of the agent who performed surveillance." Id.  While true, that distinction does not undermine Polivy's opinion.  It is apparent from the videotape surveillance (which Polivy reviewed) that Falk sometimes walks with an antalgic gait and sometimes walks without one, so it is not surprising that Falk may have walked with an antalgic gait on the day of the FCE, but not on the day of Polivy's IME.

What this all boils down to is that, with the burden of proof allocated to Falk, the court cannot credit the opinions of

---

FCE results.  That line of attack would not persuade the court, anyway:  while an FCE may be helpful in forming a full picture of a claimant's capabilities, it is not a foolproof method and can be limited by the claimant's subjective level of effort.  See Lake v. Hartford Life & Accident Ins. Co., 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004) ("[I]t is often the case that an individual is not motivated to perform at their maximal level of functionality in the setting of [an FCE].").  As LINA notes in its memorandum, see Deft.'s Mot. for J. on Admin. R. (document no. 25) at 19, the FCE results in this case may have been compromised by inconsistent effort on Falk's part--no doubt informing the opinions of Drs. Polivy, Schneider, and Atta.

Drs. Hsu and Ferlan over those of Drs. Polivy, Schneider, and
Atta.  The record supports the conclusion that, consistent with
the opinions of Drs. Polivy and Schneider, Falk retains the
capacity to perform full time light duty work.

That does not conclude the court's analysis of Falk's claim.
There is still one loose end to tie up.  Falk argues in passing
that even if the court accepts LINA's position that he can
perform light duty work, he should still be considered disabled
because he has no experience performing any of the light duty
jobs identified by LINA's vocational specialist.  See id. at 29,
32.  That argument was not presented to LINA, although Falk had
ample opportunity to raise it during his two internal appeals of
LINA's denial, and it is too late for Falk to do so now.  See
Frost v. Hartford Life & Accident Ins. Co., 2010 DNH 017, 27; see
also Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24
(1st Cir. 2003) ("Even where de novo review exists under ERISA,
it is at least doubtful that courts should be in any hurry to
consider evidence or claims not presented to the plan
administrator.").  Yet even assuming that Falk could raise his
newfound argument for the first time at this late juncture, the
fact that he has no experience in any of the jobs that LINA
identified is irrelevant.  The touchstone for disability under
Unitil's policy is not the claimant's inability to "perform the

34

material duties of occupations in which he or she has
experience"; it is the claimant's inability to "perform the
material duties of any occupation for which he or she is, or may
reasonably become, qualified based on education, training or
experience."  While Falk implies (without explicitly stating)
that he is not presently qualified to perform any of the jobs the
vocational specialist identified, see Pl.'s Mot. for J. on Admin.
R. (document no. 22) at 29, he makes no argument that he cannot
"reasonably become" qualified to perform those jobs.

In sum, Falk has not carried his burden of demonstrating
that he is disabled within the meaning of Unitil's disability
policy.  Judgment will be granted in LINA's favor on Falk's claim
for benefits.

**B.   LINA's counterclaim**

LINA has also filed a counterclaim seeking reimbursement of
what it claims to have overpaid Falk in the period during which
he was eligible for both disability benefits under Unitil's plan
and Social Security disability benefits.  LINA brings this
counterclaim under 29 U.S.C. § 1132(a)(3), which authorizes a
plan fiduciary to bring a civil action "to obtain other
appropriate equitable relief . . . to enforce . . . the terms of
the plan."  As interpreted by the court of appeals, this section

entitles a fiduciary to recover in equity funds that it has
overpaid a claimant under the terms of an ERISA plan, at least
where such recovery is authorized by the plan. Cusson v. Liberty
Life Ins. Co. of Boston, 592 F.3d 215, 230-32 (1st Cir. 2010).
LINA has demonstrated its entitlement to reimbursement here.

As discussed in Part II.A, supra, Unitil's policy provides
that if a claimant receives disability benefits from another
source, such as Social Security Disability Insurance, LINA "may
reduce the Disability Benefits by the amount of such Other Income
Benefits."  It also provides that LINA "has the right to recover
any benefits it has overpaid" by "request[ing] a lump sum payment
of the overpaid amount;" "reduc[ing] any amounts payable under
this Policy; and/or tak[ing] any appropriate collection activity
available to it."  LINA invokes these provisions of the policy,
contending that it is entitled to judgment in the amount of
$30,965.10, which it asserts is the remaining balance of its
overpayment to Falk.

Falk has not addressed LINA's counterclaim in his motion for
judgment on the administrative record.  While LINA has moved for
judgment in its favor on the counterclaim in its response to
Falk's motion, Falk has not submitted a reply, though he was

entitled to do so under Local Rule 9.4(c).[10]  And, when given the
opportunity to argue the merits of LINA's counterclaim at oral
argument, Falk declined to do so.  Accordingly, it appears that
Falk does not dispute that he is obligated, under the terms of
LINA's plan, to reimburse LINA for the amount of the overpayment.
Judgment is therefore granted in LINA's favor in the amount of
$30,965.10, which Falk's counsel agreed at oral argument was the
appropriate amount of any award to LINA on the counterclaim.

## IV.  **Conclusion**

For the reasons set forth above, LINA's motion for judgment
on the administrative record[11] is GRANTED, and Falk's motion for
judgment on the administrative record[12] is DENIED.  LINA is
granted judgment in the amount of $30,965.10.  Each party will
bear its own fees and costs.  The clerk shall enter judgment
accordingly and close the case.

---

[10]In its order of March 12, 2013, the court noted that a
reply was "not anticipated," but did not preclude Falk from
filing one.

[11]Document no. 25.

[12]Document no. 22.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  September 23, 2013

cc:  Leslie C. Nixon, Esq.
     Byrne J. Decker, Esq.